Good morning, Your Honors. May it please the Court. Michelle Roberts on behalf of Plaintiff, and it's Dan Demer. Demer. All right. And I'll monitor my time, and I'd like to reserve... Everybody's entitled to have their name pronounced correctly in this court, so... Great. And, Counsel, the acoustics in this room are not very good. We've been here all week. And so you will have to speak up. There's a bit of an echo we just can't compensate for. Absolutely, Your Honors. Your Honors, my client, Dan Demer, was a hardworking 53-year-old career software engineer for IBM when, by 2010, his chronic severe degenerative disc disease, which impacted him diffusely from the top of his neck all the way down to his hips, required that he take morphine three times a day, Flexeril, a muscle relaxant, and other neurological significant pain medications in order to control his debilitating pain. Now, there's no dispute in this case that Demer has severe degenerative disc disease. MetLife doesn't dispute that. MetLife also does not dispute that his treatment regimen, including the powerful narcotic medication, was appropriately prescribed and that he was compliant with his treatment. Ms. Roberts, what is the evidence in the record of specific pain and cognitive impairment that was so severe that would prevent him from working even a sedentary job? Your Honor, that's... Your Honors, with respect to the evidence of cognitive impairment, I mean, what you have is the sort of, in some ways, the common sense argument that you're taking 30 milligrams of morphine a day regularly, that that's going to impact you cognitively from performing a job that's at the level of a software engineer. But the degree of impact from morphine may vary from person to person. People respond differently. I'm asking what's in the record here other than a general description. Is there anything specific that would indicate that Mr. Demer was not... Right. Well, Demer testified through his declaration that he was unable to, as a result of the pain medications, focus on very basic things, particularly when it came to computer use or, you know, inputting data. And he talks about that in his declaration. But the MetLife determined that he could not work at his present job, but that he would be able to work at a more sedentary position. And his doctors did say that he seemed to be oriented, you know, time, place, and... Right, yeah. I'm happy to address that argument. Whether or not someone has the cognitive capability of doing a job, and, yes, he was a software engineer, and they did find him disabled from his own occupation, but the any-occupation standard is one that he can do, be given his education, experience, and training. He is a trained software engineer. All of the positions they identified that he could perform still require a high level of cognitive functioning. And whether or not you are oriented to your time, your person, your place, all that's saying is you're not delusional. And the cognitive requirements of performing at a level of a software engineer requires more than just that you know who you are. Is that the test, whether he was able to perform a job as a software engineer for long-term disability? I thought it was any. The test is whether or not he can perform any gainful occupation, and that is one... It changes. Can I just, to make sure that we're clear on this, when we get to long-term disability, it changes. This is the point Judge Chen is making. Are we wrong about that? We're still... What's in dispute in this case is the long-term disability benefits. He was paid under the own-occupation standard for 12 months. That was a long-term disability benefit. So, counsel, our question is just that. It changes to a different standard for long-term, right? Exactly, Your Honor. Okay. But my argument is that even the occupations that they identify, that is one that would provide him gainful employment, so any occupation, still require a high level of functioning. It's not enough that he can just do any job. It's not that he can just sit there at a toll booth, for instance, and pass out tickets. He's got to be able to earn 60 percent of what he was earning before. And the jobs that they identified that they said that he could do still have a high level of cognition. And so there's the issue of the pay medication, but there's also... Just to back up. Right. So it's any job that would yield 60 percent of his earlier income, and that's what gets to the place where you think he has to use, employ a higher level of cognitive functioning, because he has to be able to hit that mark? Correct. Is that it? Yes, Your Honor. Okay. Thank you for your patience. Yes. All right. Yeah, so there's the issue of the side effects of the pain medication, and then there's also the issue of his pain and whether or not, you know, how long he can actually sit there. And, you know, we're talking about the physical exertion requirements. It's not enough that he can just sit still for half an hour at a time. He's got to be able to focus. And based on the evidence that's in the record, his constant pain complaints that really are unrefuted. I mean, there's no evidence here that his statements aren't credible, except for the paper reviews that they hired, and the reviewers routinely review claims for MetLife. What do we do with the fact that Dr. Moore apparently told Dr. Gordon that Mr. Diemer could very likely do a sedentary job, notwithstanding all that he still was of the view that he could probably work? Your Honor, well, so with respect to that statement, that's Dr. Diemer, I mean, Dr. Gordon's summary of his conversation with Dr. Moore. And what he said was that maybe he could do some type of sedentary job. But he later clarified, and he clarifies in his other attending physician statements, that Diemer's disabled, that given the entire whole picture makeup, considering his pain and the cognitive impairments from his pain medication, that he's not able to work full time. And so I really don't think that that can be taken out of context, to say that Moore supports Diemer's ability to do sedentary work, because he really doesn't. All of his treating physicians support that he is disabled by taking the whole picture analysis or look at him. And that statement by Dr. Moore is after his conversation with Dr. Gordon? Yes. He provided a letter, I believe, which clarified what his position was. But all throughout Diemer's claim, when he's completed the attending physician statements, he supported disability. What about Dr. Wideman's comment in his notes, that he had no disagreement with the conclusions of the June 10th IME, and he thought that the recommendations were, quote, very fair? What about that? Right. Well, just to clarify it, Your Honor, it wasn't an IME. It wasn't an independent medical evaluation. It was a paper review. But what he said was that he thought that Dr. Del Valle's assessment was a fair assessment. And that's? It's really unclear what he means by it's a fair assessment, because Dr. Del Valle said, I agree with Dr. Wideman's APS from 2009. But Dr. Wideman's APS from 2009 supports disability. He says that his disability was multifactorial and that he could only sit for approximately four to five hours intermittently and would need to be able to take breaks as necessary. But what Dr. Del Valle did in her addendum, completely unjustifiable, when she was given evidence that his condition had worsened, said that he could sit more than what she initially said when she agreed with Dr. Wideman. So I don't think that you can take Dr. Wideman's comment in this record that it was a fair assessment, because he continued to support disability, and he said so as well. He also documented in that same record, I believe, that Diemer wasn't even able to sit for two hours in a waiting room at the doctor's office without getting up, losing his footing, and falling. So how he could actually sit and perform even a sedentary type of a position, it's not supported by the record. What do we do, counsel, with the additional evidence that you submitted after MetLife denied the appeal? Your Honor, you know, that evidence, I believe, is properly part of the administrative record. For one, MetLife actually produced it in this litigation as part of the administrative record. And the counsel's letter, which enclosed all that evidence, said, you know, the doctor's said they sent this to you directly, right before you terminated the claim. This is relevant. They considered it. And I think by considering that information and conducting a voluntary review, they were acting as if I do, Sherry, and that that's properly ---- Well, they sent it over to a nurse practitioner to review. Right. So they said we're not going to consider it, but just to be cautious, we sent it over to a nurse practitioner. Right. That's not exactly the same way that they treated everything else. Well, Your Honor, I don't know that they said they weren't going to consider  it. They just said it doesn't change our opinion. But that means that they did consider it. I mean, they did have to look at it. Have to have considered it to some extent to decide it doesn't change your opinion, right? Right. In the social security context, when a claimant submits additional evidence and the appeals counsel reviews it, we consider it part of the administrative record. But that ---- those rules don't necessarily apply here, do they? But, Your Honor, I'd like to direct your ---- there's a case, and I don't think it's cited in the briefs. It's Vega. It's out of the Fifth Circuit. And it's cited with approval in Abatey. And really, as long as the administrator has given ---- was given a reasonable opportunity ---- The Seventh Circuit didn't think very much of Vega, did it? No, it did not. But I think with respect to just this point, it's the Fifth Circuit. But, you know, that ---- Well, let me tell you what my concern is. Okay. And then you ---- I'll give you a chance to respond. So address my concern. So here is my concern. My concern is that MetLife probably doesn't have to consider this. They've closed the record. They've denied the appeal. You provide them with additional evidence. And MetLife says, okay, we'll just take a quick ---- we're just going to take a peek at it. If we now then deem them subject to the same rule that the Appeals Council at the Social Security level is subject to, that is, that if the Appeals Council considers it, it becomes part of the administrative record. The incentive in the future will be for MetLife to say, we won't consider it. We don't have to consider it. And we know what the consequences are if we do. That is, that we're then bound by all of this. And so the record ---- so it won't get done in the next case. Your Honor, MetLife's a fiduciary. And this information was submitted literally days after they made a decision. Right. And evidence ---- But at some point you declare something over. Right. And if we issue a decision and then you come back with additional information which you want us to consider, we will tell you that it's too late. Your Honor, you know, I'm happy if the Court just considers the evidence that was before the administrator, before it made a final determination. Because it's really supportive. I mean, the supplemental information, yes, it was updated MRIs that showed some significant worsening. But the bulk of the evidence which supports his disability was already considered by MetLife. And so I think that it's supportive. And they rely on Dr. Wiedemann's fair assessment. And that's in that supplemental batch. So if you don't want to consider that, then you won't consider Dr. Wiedemann's statement, which, you know, taken out of context, would not support Deamer's claim. But with respect to this, like, you know, production of last-minute evidence, I want to address the Rule 26 issue, if I may. They at the last minute produced affidavits by witnesses that they failed to disclose that the Court relied on to say, you know, I'm not going to apply any skepticism. Didn't you have the ability to ask for, for instance, Rule 56d, relief, if they come in in summary judgment or late with something that wasn't disclosed earlier, wouldn't you have the right to say, well, wait a minute, we need a chance for a fair discovery?  Your Honor. And you didn't do that. Well, yes. Well, at the trial court level, we did make an explicit Rule 56d request, but they objected to the evidence, and she said, well, I'm not going to, you know, permit you to do discovery now. It's too late because you didn't take a 30b-6 in the beginning of the case while discovery was open. But there was no, you know, it's their burden to show that they're not conflicted. But the district court expressly foreclosed any additional discovery? She didn't permit it. I can't recall offhand if she said in her opinion, I'm not going to allow it at this point, but she said that you're not prejudiced. But my understanding is you just said there wasn't a request for it. Did I miss that? Did I get that wrong? Well, I don't think it was styled as a Rule 56 request. Well, whether it was styled, forget it. I'm not concerned about how it was styled. Was there a request? At that point to conduct additional discovery, I don't believe so. No, Your Honor. Okay. Thank you for your candor.  But, again, you know, it's their burden to demonstrate that they're not conflicted. And Rule 26, A1, B1, the exception, doesn't apply to ERISA cases just because we're looking at what we call an administrative record. Nolan in 2009 says evidence of conflict of interest is outside of the administrative record. So there's no reason that the rules of civil procedure when it comes to disclosures wouldn't apply when it comes to conflict of interest information. Demers should have been given a fair chance to ---- And what if they do? What if they do apply? I'm sorry? What if they do apply? What if Rule 26 applies? Uh-huh. Then the Court should not have considered those affidavits. And it would not have served to reduce any type of skepticism that she would have appropriately applied in this case. All right. And, Your Honors, if I may, reserve the balance of my time. Certainly. Thank you very much. May it please the Court. It's undisputed that the district court properly evaluated MetLife's claim decision under the abuse of discretion standard of review. MetLife and the plan contend that there's substantial evidence in the administrative record supporting MetLife's determination that terminated benefits for Mr. Demer after 24 months of paying benefits based on his depression, which was limited to two years under the plan. Is the subject of our review at this point the final denial decision in 2011 and not the initial denial decision in 2010, to the extent that there may be some differences between the two? Yes, Your Honor. The decision before the Court is the final decision on appeal. Well, then let me ask you, the final decision, which appears to adopt Dr. Gordon's physical restrictions, talks about sitting an hour at a time with breaks up to seven hours in a day, being able to lift 20 pounds occasionally, 35 pounds rarely, occasional bending, twisting and stooping. That's part of the findings in the final appeal. And I'm wondering where does that come from? Where does Dr. Gordon get that? Because to the extent the administrator concurred with Dr. Wideman's 2009 limitations, these limitations are quite different from what Dr. Wideman found in 2009 and 2010. Your Honor, it is true that Dr. Gordon had different restrictions and limitations that he opined were supported than Dr. Del Valle, and that MetLife in its final decision letter outlined Dr. Gordon's findings. But ultimately it was the medical information in total that MetLife found did not support disability under the anti-occupation standard of review. But you say it was supported by, you know, it was a reasonable decision, supported by evidence, and I couldn't find where these limitations, which were quite a bit more expansive than what Dr. Wideman found, came from. I didn't see anywhere in the record that he could lift 35 pounds or that he could stoop and twist, given the back problems and the nerve problems that he had. Where does that come from? Where does Dr. Gordon's restrictions and limitations come from? Yes, since he did not conduct any examination. This was a paper review. Correct, Your Honor. It's based on his review of all of the testing that was done that showed normal, the MRIs and the testing, and evaluating that based on what the restrictions and limitations would be, in his opinion, based on his experience, in light of those objective findings, and on the clinical observations of his treating physicians as opposed to their conclusions. So in other words ‑‑ So just to stop there, forgive me for interrupting, but do any of the clinical ‑‑ going back to Judge Chen's point, do any of the clinical observations include the caliber of restriction that wound up in the final report? Any one of them? I'm sorry. Well, I think your response is he looked at the totality, but if no part of that totality, if no piece of the earlier evidence supports that level of restriction, I'm ‑‑ I've got the same question as Judge Chen. Yes, Your Honor. Well, when applying restrictions and limitations in terms of a weight limit for carrying or in terms of how long a claimant can sit or stand, even an examining physician is not observing the claimant sit for a certain period and decide that that's how long he can sit or carry a certain weight and deciding that's how much he can carry. Even an examining physician and his treating physicians are giving their opinion about how long he can do those things in light of what they're observing and what they're ‑‑ I'm just trying to figure out what supports that restriction. Is it ‑‑ yeah, what is it? Well, again, going back to what the treating physicians are saying, they are concluding he has certain restrictions and limitations. For example, the treating neurologist is concluding that he can sit for five hours, he can stand for five hours intermittently during the day. Some of the other treating physicians, Dr. Moore and Dr. Osborne concluded that he couldn't sit or stand for more than an hour a day. So they have varying opinions with respect to ‑‑ Seven hours is a lot more ‑‑ is greater than between zero and five. That's what I'm asking. Where does a seven hour ‑‑ that's a big difference, to be able to sit seven hours means you could work a full day, but if you can only sit four hours or five hours even with intermittent breaks, that's a pretty severe restriction. Well, Your Honor, the evidence with respect to what was preventing Mr. Diemer from being able to do certain tasks was that his pain was limited, limiting because of his orthopedic issues. And the question is, the question posed to the various doctors is, what does that limiting pain, how does that impact what you can do? And, you know, some of the doctors concluded that he could sit for longer periods before having to move and change positions, and frankly, Your Honor, it varied from his treating physician to treating neurologist. The conclusion was that, well, for Dr. Devaye, for example, she accepted Dr. Weidman, the treating neurologist's restrictions and limitations, and accepted even with those limitations, he could still ‑‑ he was still not impaired from ‑‑ But did not accept his ultimate conclusion that Mr. Diemer couldn't work due to multiple factors, including chronic pain and depression. Doesn't that sound like cherry picking? It's I'm going to accept this but not that? What's the basis of rejecting the effect of the depression? Well, Your Honor, the plan limits benefits for depression to 24 months. Right. But that's not what's at issue here. They denied it, not based on the ‑‑ is that what happened here? They based it on the 24 months running out? For depression. We paid for 24 months for the depression. And the only reason ‑‑ What about the chronic pain? What about the chronic pain? Right. So the chronic pain is what was at issue after the 24 months. The depression was no longer at issue. At that point it was the chronic pain. And the pain was considered. In fact, that's the reason for providing those restrictions and limitations. In other words, the reviewing doctors that provided their opinions with respect to the restrictions and limitations were basing that on his subjective reports of pain. That is what was causing him to not be able to sit for eight hours. Did the administrator necessarily have to reject the credibility of Mr. Diemer and his supporters' subjective description of pain? I mean, his description was that the effect of the medication and the pain were so substantial that he couldn't work. I would assume that the administrator, although not expressly, had to implicitly reject that, correct? Your Honor, MetLife did not reject his pain as a reality, that he experienced pain. The degree of his pain, the extent of his pain. The impact that his pain would have on his functionality and ability to perform a sedentary occupation. That's where the disagreement lies. Right. And they had to reject his claim that he couldn't even do a sedentary job. The severity of it, yes. Right. Right. MetLife rejected the claim that he couldn't do a sedentary job. That brings us to the recent Sixth Circuit case, the Godmar case v. Hewlett-Packard. What's your view of the jurisprudence of the Sixth Circuit that seems to suggest that if an administrator is going to reject on the basis of credibility subjective testimony and evidence of pain, to do so on a purely paper record is sort of skating on thin ice in terms of the abuse of discretion standard? What's your — is the Sixth Circuit out of whack? Are they — is that something that we should reject? Well, Your Honor, I think it's not just a question of whether you're looking at pain and that's all the evidence you have, and then are you going to have an IME to evaluate that. When there is additional evidence in the administrative record that contradicts the severity claimed with respect to the pain, in that circumstance where there is evidence from the treating physicians, from their office visit notes that were contemporaneous with those visits that conflict with the level of severity of pain that's claimed by the claimant, then in that case, I don't think it would be necessary to have an independent medical exam because you have evidence in the record that directly contradicts the assertion of pain. So what's the best evidence of that in this record that contradicts the assertion of pain, considering almost every treating physician found that he was disabled, in part because of pain? Correct, Your Honor. Starting with the neurologist, Dr. Wideman, again, his restrictions and limitations would not have precluded the claimant from performing any occupation. So although he concluded generally that the claimant was disabled, the restrictions and limitations that Dr. Wideman provided would not have actually precluded him from performing his work. That's if you only look at the physical restrictions. But when he said there are multiple factors here, including pain, he reached different conclusions. So how does that undermine the claimant's subjective testimony here? You said if there's something in the record that undermines the credibility, then it's okay to do a paper. So that doesn't sound like there's a contradiction there. Well, for example, there are contemporaneous office visit notes. The claimant claimed general cognitive impairment. And there are contemporaneous office visit notes that not only find the claimant to be oriented and, and, you know, are not indicative of lethargy or other suggestions of cognitive impairment, but there's no, you know, no clinical evidence that, that is documented in those office visits that would suggest that there was cognitive impairment. There's a general statement by the doctor adopting the claimant's complaints of cognitive impairment, but there's nothing in those records over time that support that there was cognitive impairment. What would an example of that be? What would have been enough? Well, there are many mental status exams that can be done. That's not, you know, that doesn't rise to the level of cognitive testing. Certainly cognitive testing reveals whether or not there's cognitive impairment, but there are certainly clinical evidence that are short of that, such as many mental status exams that are commonplace in, in physician exams. And even something as simple as doctor's observations of patient lethargy or confusion or slow speech. That's where an actual exam by the consulting physicians might have been helpful here. Except there was an absence of any of that by the treating physicians that had examined him over time. But I think opposing counsel's response on this point, just to follow up on Judge Chen's question, is that it's not any occupation. It's any occupation that would allow him to earn 60 percent of his previous income, and those types of jobs, in his case, were going to be, because he had a good job and he had a pretty high income, so the question is not any occupation. It's an occupation that would allow him to operate at a pretty high cognitive level. One of my concerns is whether or not the treating and examining physicians were putting that gloss on it, or whether they understood any occupation meant even, you know, sort of any type of sedentary work without regard to the level of income he could generate. Well, there was an occupational analysis based on the restrictions and limitations that were provided to assess what jobs were available based on those limitations. So if there was a cognitive impairment that had been documented, that would have been taken into consideration in that vocational analysis. But if it — Didn't that analysis assume no cognitive impairment? That — that occupational analysis did not — did not have a limitation on workability and functionality based on cognitive impairment. None whatsoever. Yes. There was none, right? I'm sorry? So I think the answer to your — the question is yes. There was no cognitive impairment restriction, right? It assumed that. Correct, Your Honor. Okay. But isn't it also clear in the record that this person is taking morphine every day and nobody disputes that he needs morphine for his pain? Your Honor, there's no dispute with respect to the fact that the claimant was taking medications, not just morphine, but other medications. The question is whether or not there was cognitive impairment evidenced in the record as a result of those medications. And there is not — while there is a general statement by the claimant and by one of his treating physicians that he was — that he was impacted by the medication, there is no record to support — Well, what's the difference between a general statement in the record and a record to support? I'm — I don't — I'm not trying to give you a hard time, but it seems to me that's in the record. So what's your best response? Well, Your Honor, when I'm talking about a record, I'm talking about the contemporaneous office visit notes. When the — when the claimant goes in to his doctor, reports what's going on, the exam. Over time, there is nothing in those exam records that support a cognitive impairment. Now, later, in making a statement to MetLife on behalf of the claimant and giving an opinion about disability, at that point, the — the treating physician adopted the claimant's representation that he had cognitive impairment. But that was not documented in the medical records over the course of the time. Well, what would that have looked like? I mean, what would a doctor have had to see? The doctor would have had to said, you seem a little loopy today because you're on morphine or — Well, typically, it's not uncommon at all to see in medical records a doctor's observation that a claimant — I'm sorry, that a patient is lethargic, is confused, isn't answering the questions, is demonstrating fogginess or — they're — all of those things are things that are often — And cognitive impairment would have to go all the way to that? I mean, you can't just say, gee, I just feel like I've got a bunch of rubber bands on my forehead and I just can't think clearly right now? Well, Your Honor, if that had been — if that had been stated by the patient, then it would have been pursued by the doctor, presumably. But those statements are not in the record, in those office visit notes. Those statements by the claimant, like you're describing, are not in the record. Counsel, I think you're out of time, but I'm going to, with Judge Bivey's permission, just ask one more question. Sure. I'm concerned about conflict of interest for a couple of these physicians. Delvalier and Gordon, in particular, were earning a lot of money. I think, in one case, $175,000 a year, on average, during this period of time for a couple of years in a row, and the other $125,000 a year doing these types of examinations. So it's a concern. My question is, what was done in this case to minimize any risk of conflict? Okay. So two parts to that. Firstly, Your Honor, the question at issue is whether MetLife is conflicted in its decision-making. And the fact that in this very record, you have a doctor, Dr. Goslin, a psychiatrist, who similarly had reviewed many claims before, had similarly received significant sums of money. So isn't opposing counsel right that it's your burden to show no conflict? Your Honor, with respect to the conflict, the structural conflict is automatically applied as a factor. Right. And then with respect, if there's nothing more than the structural conflict, then, you know, that will impact how much it's weighed. Under Glenn and Abatey, the Court said that a claim administrator may submit affirmative evidence that it made efforts to reduce the bias. And that was done in this case. So that's my question. What was done in this case? Okay. So there was evidence in the declarations that MetLife separates its claims and financial functions so that the claims office and the financial office are in a position to be supervised financially for making claim decisions one way or the other. But the question is about these doctors, not just the staff of the administrator. The question is about using these same doctors over and over again. Judge Chan is exactly right. That's my concern. I mean, I don't see in the declarations where it says we use, you know, we don't use the same physicians over and over again. We limit their, you know, income to a certain percentage or a certain amount. That's the question. There's case law on point expressing skepticism or concern about using the same physicians on these cases on the defense side or, frankly, I think the same question would be, could be put to the other side, but over and over again. That's the point. So what has been done here? Well, and MetLife does not dispute the information with respect to how often those doctors reviewed claims or how often they or how much they were paid. That information is accurate, so there's not something in the record where we dispute that information or anything that goes to that. Rather, the information supports that MetLife considers whether the physician consultant is supporting the claimant's restrictions and limitations, that results in payment of benefits, or whether the physician consultant is supporting benefits, is disagreeing with the treaters, and it doesn't support benefits. This record itself shows that MetLife considers that and evaluates that, and in this case, it adopted a physician consultant review that supported the claim and paid for 24 months based upon that. So MetLife, are you telling me MetLife keeps records of how often these folks opine that benefits should be provided? No, it does not. No, it does not. Why not? Wouldn't that be a very easy way to show that MetLife is concerned in making sure that they aren't essentially hiring the same type of physician to get the same type of opinion? Wouldn't that just be the very most effective way to make sure you're not in this position today? Well, every medical opinion is based on the facts of that specific claim. But it's very difficult when we get here, and we have medical opinions based on folks who haven't been examined. You know, just the paper review is inherently very difficult for us. Your Honor, what I would say to that is if you were looking at a bald conclusion from a physician consultant that opined that someone was not impaired or was impaired, then you could say, well, I don't have enough information here to know whether or not this is a reasonable decision or not. So the fact that this person makes a lot of money and reviews a lot of claims is very important to me. But in this case, the decision the ‑‑ I'm sorry, the opinions of the medical consultants were detailed. They went through, and as the district court found, they went through a detailed chronology of the medical. They considered each of the treating physician's opinions. And they either adopted, or if they rejected, they explained why they were rejecting. So the opinions themselves demonstrate their reasonableness. And so by looking at those, it's evident from the record itself that there wasn't a bias because they are explaining the bases for their decisions.  Thank you, Your Honor. Ms. Roberts, you have time reserved. Yes. Thank you, Your Honors. I want to make a few follow-up points. I just want to clarify that they didn't actually pay benefits for 24 months. The 24-month limitation is not at issue here. What happened is there's an own occupation period that lasts for 12 months. And it was at that 12-month mark that they decided he was not disabled from any occupation. It wasn't because he had exhausted the 24 months of benefits for the mental illness limitation. With respect to the standard of review ‑‑ That's still at issue, is what you're saying. The depression is still at issue because he wasn't even paid for the 24 months? You know, we're not contesting that he was disabled as a result of his depression and that he should have been paid additional time for his depression. The argument is that, as a result of his physical condition, he was unable to perform any gainful occupation for which he's qualified by education, experience, and training. And, you know, the United States Supreme Court and this Court has made clear, Metlifey, Glenn, Abatey, Nolan, Saloma, Montour, the Court has to apply some degree of skepticism to Metlife's decision as a conflicted administrator. Here, she applied no discretion ‑‑ I'm sorry, no skepticism at all to their decision and, in part, relied significantly on these last‑minute affidavits. To your question, Judge Christin, about, well, what did you do to minimize conflict, really, it was nothing. They relied on paper reviewers that they routinely go to. And if there was going to be a ‑‑ you know, if there was a dispute, as there was, between their treating doctors and the paper reviewers who they relied on to discount subjective evidence of pain ‑‑ Well, why is it in Metlife's interest to have reviewers who will consistently turn down the claims? So that they can save money by denying claims. Well, but they've divided off their financial people from their evaluation people. And it seems to me that if Metlife comes in and gets creamed in court, that they're going to spend a whole lot more money and lose credibility in the long term if they're just routinely doing this. Well, Your Honor, I mean ‑‑ It seems to me that there's a real financial incentive in the long term for them to do this. It seems to me there's a little straighter than you just characterized it. Right. But, Your Honor, that's just not ‑‑ that long-term incentive just isn't demonstrated in the way that they've administered my client's claim. They relied on paper reviews that just discounted ‑‑ Well, that goes to your claim, then. It doesn't really go to the question of skepticism. The question of skepticism is a structural problem, not an individual problem. Right. But this Court has made clear in Montour that where you have paper reviews that discount things like the subjective evidence of pain, that relying on them is evidence of conflict, and it's an abuse of discretion. What we're asking the Court to do is follow really a well-trodden path that's set forth by the Ninth Circuit. The only somewhat novel issue is the Rule 26 issue, which I think that this Court, you know, in line with its decision in Nolan, will say that the rules of civil procedure apply to evidence of conflict of interest. And that's what we're asking the Court to do here, because if the district court didn't rely on these self-serving conclusory affidavits, I think she would have applied a level of skepticism that was much more significant than she applied here and would have taken a harder look at Dr. Gordon and Dr. Del Valle's opinions, because they're not supported. And with respect to the cognitive testing, they didn't say what they wanted. They didn't say why it wasn't enough that Deamer complained that he didn't have the cognitive ability to work. If they wanted, like... Was there any clinical observation in the record contemporaneous that shows that kind of description? That he complained? Yes. Yeah, I mean, there's like a note from Dr. Deborah Wideman in 2009 where she says, you know, the goal is to keep him off of opiate medications. He, in general, has not done well with them in terms of side effects. Another note from 2007 that, you know, a duragesic patch makes him druggie. I mean, there's these general statements of how he feels, but no one from MetLife told him to get a neurocognitive evaluation. And in Safan, this Court said, if you're going to require that, that is your responsibility to communicate that to the claimant so that the claimant can perfect his claim. And he was deprived of the opportunity to do that. What more? I mean, he didn't know what else to submit other than to say, this is how I feel, this is what I tell my doctors, and this is what my third-party witnesses also attest to as to my cognitive abilities and my experience of being in constant chronic pain. Okay. And then, you know, with respect to this issue of the IME, I think, you know, it was just really... I'm not saying that in every case that an IME is necessary, but where you have a claim of disability that is based primarily on subjective pain, that an IME is important, especially where you have paper reviewers who are trying to discount that. And there's really no evidence in the record that contradicts the severity of what he's reporting. I mean, yes, there's, you know, a statement where the doctor says he's oriented times 3, but that's their best evidence. And that's just not enough. And, Your Honor, I think I'm out of time. You're well over your time. Okay, thank you. We appointed your opponent some additional time, so I didn't mind letting you finish up. Okay. All right. Thank you. We thank both counsel for the argument. It was very helpful. Diemer v. IBM Corporation is ordered submitted.
judges: Bybee, Christen, Chen